NO. 07-01-0112-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO





NOVEMBER 14, 2001



______________________________




TERRY TULL AND KATHRYN TULL, INDIVIDUALLY AND 


AS NEXT FRIENDS OF AMBER AND STEPHEN M. TULL, APPELLANTS



V.



CHUBB GROUP OF INSURANCE COMPANIES, FEDERAL INSURANCE COMPANY

AND SOUTHERN FARM BUREAU CASUALTY INSURANCE COMPANY, APPELLEES



_________________________________



FROM THE 237TH DISTRICT COURT OF LUBBOCK COUNTY;



NO. 96-558,083; HONORABLE SAM MEDINA, JUDGE



_______________________________




ORDER ON MOTION TO DISMISS


 Pending before this Court is appellants' motion to dismiss this appeal for lack of
jurisdiction. Appellants contend that the order appealed from is interlocutory and that their
notice of appeal was prematurely filed. For the following reasons appellants' motion is
overruled. 

 Appellants timely perfected this appeal from the trial court's order of February 21,
2001, granting summary judgment in favor of appellees Chubb Group of Insurance
Companies and Federal Insurance Company and severing the underlying action from the
remaining claim against Southern Farm Bureau. By their motion, appellants contend the
trial court signed a second order on May 29, 2001, vacating its prior order of severance
and reciting that the portion of the February 21 order granting summary judgment in favor
of Chubb Group and Federal "remain in force as an interlocutory order pending final
resolution of all claims . . . ." An uncertified copy of the May 29 order is attached as an
exhibit to appellants' motion to dismiss. However, it is not contained in the clerk's record
and thus cannot be considered as part of the appellate record. Tex. R. App. P. 34.1; see
also Carlisle v. Philip Morris, Inc., 805 S.W.2d 498, 501 (Tex.App.-Austin 1991, writ
denied).

 Therefore, we now suspend the appellate timetable for 15 days from today's date
to allow appellants time to supplement the clerk's record with the order of May 29, 2001,
and any other appropriate documents. However, because we will not decide at this time
whether the May 29 order vacates the February 21 order for purposes of finality,
appellants' brief will be due to be filed within 30 days from the termination of the 15-day
period of suspended time or 30 days from the date the supplemental record is filed,
whichever comes first. 

 It is so ordered.

 Per Curiam


Do not publish.



              Q.       Explain what you mean by “charging hours.”
\
                                A.       We have a labor system and we enter projects or efforts that support our\
clients.
\
'

var WPFootnote5 = '                                      [5] “Effort” is a term of art in this context, distinguished from a “project.” Orr described\
an “effort” as any “number of activities, whether or not that is (sic) administration related\
or support, asset inventories, things like that.” He also noted that some efforts are billable\
while other efforts are nonbillable.
\
'

var WPFootnote6 = '                                      [6] Then asked if Jensen’s suggestion shocked him, Marx replied, “No, because . . .\
the guy’s off the wall.” When EDS’s counsel, later in the deposition, referred to this\
occasion as “one instance where you were asked to overbill,” Marx responded, “Or\
insinuated to.” \
'

var WPFootnote7 = '                                [7] Asked if he felt Orr was asking him to do something illegal when Orr told Marx his\
billable hours were too low, Marx responded, “My guess is yes. That’s my assumption\
because if I don’t have enough billable hours – in other words, if I was doing something\
and it was not in billable work and I don’t have enough billable hours, well, wait a minute,\
why would I have billable hours – 40 billable hours if I didn’t work 40 billable hours? \
There’s a problem there.”
\
'

var WPFootnote8 = '                                      [8] Other adverse actions listed in Marx’s first amended original petition, including the\
company’s selective refusal to allow him to pursue a required certification and its refusal\
to reimburse him for previously-approved MBA course work. Those actions are not\
addressed on appeal. \
'

var WPFootnote9 = ' Before the decrease, Marx’s annual salary was about $124,500.
\
'

var WPFootnote10 = '                                      [10] When Marx transferred to Orr’s group in 2004, the position to which he was\
transferred carried a different job code than his previous position, but his salary was not\
changed.
\
'

var WPFootnote11 = '                                [11] To be considered by the trial or reviewing court, summary judgment evidence must\
be presented in a form that would be admissible at trial. Hou-Tex, Inc. v. Landmark\
Graphics, 26 S.W .3d 103, 112 (Tex.App.–Houston [14th Dist.] 2000, no pet.). Hearsay\
is not proper summary judgment evidence. Einhorn v. LaChance, 823 S.W.2d 405, 410\
(Tex.App.–Houston [1st Dist.] 1992, writ dism\'d w.o.j.) (op. on reh\'g) (holding that\
statements in affidavits based solely on hearsay are inadmissible as summary judgment\
evidence). \
'

var WPFootnote12 = '                                      [12] This appeal was transferred to this Court from the Second Court of Appeals by the\
Supreme Court of Texas under Government Code section 73.001. Tex. Gov’t Code Ann.\
§ 73.001 (Vernon 2005). By rule, we are required to apply the transferor court’s case law. \
Tex. R. App. P. 41.3.
\
'

function WPShow( WPid, WPtext )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'visible'" );
 else
 {
 if( floatwnd == 0 || floatwnd.closed )
 floatwnd = window.open( "", "comment", "toolbars=0,width=600,height=200,resizable=1,scrollbars=1,dependent=1" );
 floatwnd.document.open( "text/html", "replace" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( "\r\n" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( WPtext );
 floatwnd.document.write( '
Close');
 floatwnd.document.write( "
" );
 floatwnd.document.close();
 floatwnd.focus();
 }
}

function WPHide( WPid )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'hidden'" );
}







NO. 07-08-0022-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

JUNE 30, 2009
______________________________

RONALD MARX, APPELLANT

V.

ELECTRONIC DATA SYSTEMS CORP., APPELLEE
_________________________________

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY;

NO. 2006-40139-362; HONORABLE BRUCE MCFARLING, JUDGE
_______________________________


Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.
OPINION
          Appellant Ronald Marx appeals from a summary judgment granted appellee
Electronic Data Systems Corporation (“EDS”) in his wrongful termination and slander suit. 
We affirm.
Background
          Marx sued EDS for wrongful termination and slander in June 2006, after he resigned
his employment with the company in March of that year. Marx, a computer systems
integration specialist with an electrical engineering degree, began working for EDS in
November 2000. In April 2004, at his request, he transferred to another department, where
he worked in a group performing services for EDS’s customer Sabre Holdings, Inc. 
           Marx’s petition alleged he was instructed to engage in behavior that would constitute
fraudulent overbilling of Sabre, subjecting him to potential criminal prosecution.


 He
alleged he refused to engage in this behavior and refused to aid and abet other employees
in conspiring to do so.
          Marx further alleged that after he refused to engage in the overbilling he was
subjected to a series of adverse actions by supervisors and co-workers. His petition
contained a non-exclusive list of actions that included Marx’s exclusion from meetings,
unjustified complaints about his not being a team player, other unjustified criticism by his
supervisors, and the withholding (by co-workers with the encouragement of supervisors)
of information necessary to his work. Further, Marx alleged he was not permitted to pursue
required computer integration-related certification, and was not reimbursed, after his 2004
department transfer, for tuition for previously-approved MBA course work. The listed
actions also included a demotion and reduction in pay, and the imposition of a
performance-improvement plan (“PIP”),


 despite his “more than adequate performance.” 
Additionally, Marx alleged he was not allowed leave for surgery and other medical care,
and was required to disclose privileged medical information. His petition asserted his
March 2006 resignation was compelled by his unwillingness to further tolerate such
actions, thus he was constructively discharged. 
          Marx’s petition also alleged that before and after his resignation, one or more EDS
employees made false, defamatory statements about him to other EDS employees and
Sabre employees.   Marx alleged that EDS’s conduct was accompanied by malice, and
sought actual and punitive damages. 
          After discovery, EDS filed a motion for summary judgment, asserting both traditional
and no-evidence grounds. The trial court granted the motion, and entered judgment
accordingly. This appeal followed.
Analysis
Summary JudgmentWhen a party moves for summary judgment under both Rule 166a(c) and 166a(i),
we will first review the trial court’s judgment under the standards of rule 166a(i). If the
nonmovant failed to meet its burden by producing more than a scintilla of evidence, there
is no need to analyze whether the movant’s summary judgment proof satisfied the rule
166a(c) burden. East Hill Marine, Inc. v. Rinker Boat Co., Inc., 229 S.W.3d 813, 816
(Tex.App.–Fort Worth 2007, pet. denied), citing Ford Motor Co. v. Ridgway, 135 S.W.3d
598, 600 (Tex. 2004). If a trial court grants summary judgment without specifying the
grounds on which it relied, as here, the reviewing court must affirm if any of the summary
judgment grounds are meritorious. Sunshine Mining & Refining Co. v. Ernst & Young,
L.L.P., 114 S.W.3d 48, 51-52 (Tex.App.–Eastland 2003, no pet.). 
          A no-evidence motion for summary judgment is essentially a pretrial directed verdict
and we apply the same legal sufficiency standard in reviewing a no-evidence summary
judgment as we apply in reviewing a directed verdict. Mack Trucks, Inc. v. Tamez, 206
S.W.3d 572, 582 (Tex. 2006); City of Keller v. Wilson, 168 S.W.3d 802, 823 (Tex. 2005);
Goddard v. Northhampton Homeowners Ass’n, Inc., 229 S.W.3d 353, 356
(Tex.App.–Amarillo 2007, no pet.). We review the evidence in the light most favorable to
the respondent against whom the no-evidence summary judgment was rendered,
disregarding all contrary evidence and inferences. Goddard, 229 S.W.3d at 356, citing
Merrell Dow Pharms, Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997). 
          A no-evidence contention should be sustained where (1) there is complete absence
of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving
weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove
a vital fact is no more than a scintilla, or (4) the evidence conclusively established the
opposite of a vital fact. Merrell Dow, 953 S.W.2d at 711. A no-evidence summary
judgment should not be granted if the respondent counters with more than a scintilla of
probative evidence raising a genuine issue of material fact. Medlock v. Commission for
Lawyer Discipline, 24 S.W.3d 865, 868 (Tex.App.–Texarkana 2000, no pet.); Lampasas
v. Spring Center, Inc., 988 S.W.2d 428, 432 (Tex.App.–Houston [14th Dist.] 1999, no pet.).
When evidence is so weak as to do no more than create “a mere surmise or suspicion” that
a fact exists, the evidence does not exceed a scintilla. Ridgway, 135 S.W.3d at 601,
quoting Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).
Wrongful Termination Claim
          Marx’s wrongful termination claim relies on Sabine Pilot Service, Inc. v. Hauck, 687
S.W.2d 733, 735 (Tex. 1985). In Texas, absent a specific agreement to the contrary, an
employer may fire an employee at will for good cause, bad cause, or no cause at all. 
Montgomery County Hosp. Dist. v. Brown, 965 S.W.2d 501, 502 (Tex. 1998). In Sabine
Pilot, 687 S.W.2d at 735, the Texas Supreme Court recognized an exception to the
employment-at-will doctrine for an employee discharged “for the sole reason that the
employee refused to perform an illegal act.” See also Winters v. Houston Chronicle Publ’g
Co., 795 S.W.2d 723, 724 (Tex. 1999). The court held that a plaintiff has the burden to
prove by a preponderance of the evidence that his discharge was for the sole reason that
he refused to perform an illegal act that would subject him to criminal penalties. Sabine
Pilot, 687 S.W.2d at 735; City of Midland v. O’Bryant, 18 S.W.3d 209, 215 (Tex. 2000);
Winters, 795 S.W.2d at 724. 
 
          The Sabine Pilot exception applies when an employee has been unacceptably
forced to choose between risking criminal liability or being discharged from his livelihood.
Winters, 795 S.W.2d at 724. An employer who discharges an employee both for refusing
to perform an illegal act and for a legitimate reason cannot be liable for wrongful discharge
under Sabine Pilot; the refusal must be the sole cause for the employee’s termination. 
Tex. Dep’t of Human Servs. v. Hinds, 904 S.W.2d 629, 633 (Tex. 1995); McClellan v. Ritz-Carlton Hotel Co., 961 S.W.2d 463, 464 (Tex.App.–Houston [1st Dist.] 1997, no pet.). 
          An employee is constructively discharged when job conditions are made so difficult
or unpleasant that a reasonable person in the employee’s shoes would have felt compelled
to resign. Kosa v. Dallas Lite & Barricade, Inc., 228 S.W.3d 428, 430 (Tex.App.–Dallas
2007, no pet.). The court in Nguyen v. Technical & Scientific Application, Inc., 981 S.W.2d
900 (Tex.App.–Houston [1st Dist.] 1998, no pet.) held the Sabine Pilot exception to the
employment-at-will doctrine applies to employees who are constructively discharged for the
sole reason that they refuse to commit a crime. Id. at 902. EDS does not challenge that
holding. We agree it is possible for a constructively discharged employee to establish a
Sabine Pilot claim.
          Marx contends the sole reason for his constructive discharge was his refusal to
engage in conduct that amounted to criminal activity. EDS asserted four grounds for
summary judgment on Marx’s wrongful termination claim: (1) Marx was not required to
commit a crime; (2) EDS did not know Marx was refusing to perform an illegal act; (3) Marx
was not constructively discharged; and (4) Marx’s alleged refusal to overbill was not the
sole cause of his alleged constructive discharge. We will address two of the grounds,
expressing no opinion on the others.
          Ground One: Request to commit crime 
          To prevail under a Sabine Pilot cause of action, a plaintiff must prove two things: (1)
that the plaintiff refused to perform an illegal act, and (2) that his refusal was the only
reason he was terminated. Hawthorne v. Star Enterprise, Inc., 45 S.W.3d 757, 760
(Tex.App.–Texarkana 2001, pet. denied); see Burt v. City of Burkburnett, 800 S.W.2d 625,
627 (Tex.App.–Fort Worth 1990, writ denied) (Sabine Pilot requires that the employer, in
some form, require the employee to commit an illegal act). By its first ground, EDS
challenged the evidence it required Marx to engage in fraudulent overbilling. 
          After careful review of the summary judgment evidence, we find that the phrase
“mere surmise or suspicion,” Ridgway, 135 S.W.3d at 601, aptly describes the evidence
that EDS asked Marx to engage in fraudulent overbilling. Marx was one of several network
engineers in the group working with Sabre to change Sabre’s telephone service from “land-line” to “voice-over IP” technology. Marx testified on deposition his day-to-day duties were
varied, including such tasks as “attending conference calls to reading literature, work
information, technical documentation, sending e-mails, looking over quotes, looking at
other design guides.” He estimated 30 percent of his time was devoted to what he
considered “technical work.” Although other engineers in the group had similar duties,
none were precisely like his.


 
 
          After his transfer to the group working on the Sabre account, Marx’s day-to-day
supervisor was Gene Orr. Brian Wheeler, who physically was located in EDS’s New York
office, became Marx’s manager shortly after his transfer to Orr’s group.
          EDS required employees like Marx to account by hour for their working time. 
Network engineers entered their working time in a timekeeping system, charging their time
to accounts that included both billable and nonbillable work such as administrative tasks.


 
Reviewing the manner in which Marx and other network engineers under his supervision
recorded their time was among Orr’s duties. The hours devoted to a particular project by
the network engineers was at least a factor in determining the amount EDS billed Sabre,
and Sabre personnel also reviewed the allocation of billable and nonbillable hours by EDS
engineers. 
          Marx testified his supervisor Orr told him more than once to bill more hours. He
described an occasion he and Orr were in Pennsylvania working on a project over a
weekend. Marx testified he could not recall how many hours he recorded as billable but
Orr commented that Marx did not put down enough hours for the weekend effort,


 though
they worked 36 hours “nonstop.” He said Orr told him to correct his time sheet, but he did
not do so. He testified there were other instances in which Orr told him he did not record
enough billable hours for his work. Marx said he once responded, “I can’t do it if I didn’t
work it.” 
          Marx also testified to statements made by his co-worker Jensen, who was senior to
Marx, concerning the recording of billable hours. He described an instance in which
Jensen suggested Marx record 24 hours for work that actually had taken them only four
hours. He did not do so. Asked if he knew whether Jensen had recorded 24 hours for the
task, he responded negatively, and added, “I just know that the suggestion [was] to put
down 24 hours for four hours worth of work.”


 
          Marx further described an occasion on which he and Jensen were performing a
series of repetitive tasks. EDS’s preliminary cost estimate for the project allocated two
hours for each repetition. Marx testified he pointed out to Jensen that “once you know
what you’re doing,” later repetitions of the task took only about five minutes rather than the
estimated two hours. He said Jensen “indicated, [w]ell, just leave it the way it is because
that’s how it works.” Marx further testified that he recorded only his actual time for the
work. Asked about Jensen, Marx said Jensen told him he was recording the estimated two
hours for each repetition, and indicated Marx should do the same. Asked if Jensen
actually said so, Marx responded, “Well, that was . . . in my opinion, the suggestion.” 
          Marx’s testimony concerning Jensen’s billing practices and his suggestions or
insinuations that Marx should follow his example do not constitute evidence that his
employer required Marx to engage in fraudulent overbilling. Moreover, even when they are
considered in light of Jensen’s comments, neither Orr’s instructions to bill more hours nor
his instructions to correct his time records on particular projects or efforts permit more than
surmise he was thereby asking Marx to do so by means of fraudulently charging his time
to billable accounts.


 
          In his deposition, Marx also sometimes referred to his actions as reporting the
overbillings of other employees. As one example, he said the company retaliated against
him when “I blew the whistle on these guys who were stealing money from [Sabre through
overbilling] and [EDS], in turn, put both of them in charge of determining my performance,
whether I could keep a job or not.” An employee’s claim that he was discharged because
he reported illegal activities of other employees is not a Sabine Pilot claim. Ed Rachel
Fndn. v. D’Unger, 207 S.W.3d 330, 332 (Tex. 2006) (per curiam) (“Sabine Pilot protects
employees who are asked to commit a crime, not those who are asked not to report one”). 
 
                     Ground Two: Causation
          EDS’s no-evidence motion also challenged the evidence that Marx’s refusal to
engage in criminal overbillinging, if such occurred, was the sole reason for his constructive
discharge. Initially, Marx urges that the causation element of a Sabine Pilot claim must be
viewed differently when the plaintiff’s discharge was constructive rather than a direct
termination. Citing Nguyen, 981 S.W.2d at 902, Marx argues the causation issue is
whether the plaintiff is constructively discharged for the sole reason that he refuses to
commit a crime, “not whether actions against an employee which lead an employee to
resign are taken for the sole reason that the employee refuses to commit a crime.” We
disagree. 
          As noted, an employee is constructively discharged when job conditions are made
so difficult or unpleasant that a reasonable person in the employee’s shoes would have felt
compelled to resign. Kosa, 228 S.W.3d at 430. See also Davis v. City of Grapevine, 188
S.W.3d 748, 766 (Tex.App.–Fort Worth 2006, pet. denied); Winters v. Chubb & Son, Inc.,
132 S.W.3d 568, 575 (Tex.App.-Houston [14th Dist.] 2004, no pet.). Or, as the United
States Supreme Court has put it, constructive discharge occurs when an employer makes
conditions so intolerable that an employee reasonably feels compelled to resign. 
Pennsylvania State Police v. Suders, 542 U.S. 129, 147; 124 S.Ct. 2342, 2354, 159
L.Ed.2d 204 (2004) (describing constructive discharge stemming from hostile work
environment); see also Shawgo v. Spradlin, 701 F.2d 470, 481 (5th Cir.1983), cert. denied
sub nom., Whisenhunt v. Spradlin, 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983). 
Thus, to find a constructive discharge, a court must determine whether a reasonable
person in the employee's position would have felt compelled to resign. Pittman v.
Hattiesburg Municipal Separate School District, 644 F.2d 1071, 1077 (5th Cir.1981). It is
necessary to examine the conditions imposed, not the employer's state of mind. Bourque
v. Powell Electrical Manufacturing Co., 617 F.2d 61, 65 (5th Cir.1980). An employee thus
does not need to prove that the employer subjectively intended to force the employee to
resign. Junior v. Texaco, Inc., 688 F.2d 377, 379 (Tex. 1982); Pittman, 644 F.2d at 1077. 
See also Hammond v. Katy Independent School Dist., 821 S.W.2d 174, 177
(Tex.App.–Houston [14th Dist.] 1991, no writ). In making our inquiry, we examine only the
conditions imposed, not the state of mind of employer or employee. Hammond, 821
S.W.2d at 177.
          Whether the employee’s discharge was direct or constructive, a Sabine Pilot claim
requires proof the discharge came about for only one reason, the employee’s refusal to
perform an illegal act. See Nguyen, 981 S.W.2d at 902; Hinds, 904 S.W.2d at 633. It
follows that when the plaintiff asserts a constructive discharge, the plaintiff need not show
the employer intended to force his resignation but the proof must be that the employer,
solely because the employee refused to perform an illegal act, made conditions so
intolerable the employee reasonably felt compelled to resign. Nguyen, 981 S.W.2d at 902;
see Suders, 542 U.S. at 147; 124 S.Ct. at 2354. 
 
          We see no evidence from which a jury properly could infer that the adverse actions
to which Marx testified and that he claims led to his departure from EDS occurred solely
because he refused to engage in overbilling Sabre. The evidence to which Marx points us
demonstrates that the adverse actions he claims led to his resignation occurred later in
time than the events he identifies as requests to overbill, and demonstrates he now
believes the adverse actions to have been motivated by his refusal to participate in
overbilling. But it demonstrates nothing more.
          As noted, Marx points to insults from co-workers, the salary reduction, “unfair
criticism and discipline threatening termination and precluding transfer,” ridicule and
isolation, and interference with his medical care as compelling his resignation.


 Marx does
not contend that the insults, ridicule and isolation he suffered from the actions of co-workers stemmed exclusively from his refusal to participate in overbilling, and the summary
judgment record provides no basis for such a contention.
          The more substantive of the adverse actions occurred in early March 2006, when
Wheeler and Orr delivered to Marx his annual employee evaluation in which Marx was
rated “Below Expectations” and was given his PIP. At about the same time, he was
notified his annual salary would be decreased by about twenty thousand dollars,


 effective
the first of the next month. Orr’s instructions to Marx to increase his billable hours occurred
during 2005, as did Jensen’s suggestions regarding billing practices. Marx’s evidence
indicates that he made Wheeler and EDS human resources department personnel aware
of the “overbilling issue” no later than December 2005. But even under the but for
causation standard applicable to Title VII retaliation cases, the mere temporal proximity
between protected conduct and adverse action is insufficient to show a causal link. Strong
v. University Healthcare Sys., L.L.C., 482 F.3d 802, 808 (5th Cir. 2007). See also Roberson
v. Alltel Information Services, 373 F.3d 647, 656 (5th Cir. 2004) (“[w]ithout more than timing
allegations . . . summary judgment in favor of [the defendant] was proper”). Similar
argument based on the timing of events surely is also insufficient to demonstrate the sole
cause relationship required for a Sabine Pilot claim. See Hinds, 904 S.W.2d at 633
(comparing the two causation standards). 
          Neither are Marx’s subjective opinions of the motivation for his employer’s actions
sufficient to raise a fact issue defeating summary judgment. Texas Division-Tranter, Inc.
v. Carrozza, 876 S.W.2d 312, 314 (Tex. 1994) (retaliatory discharge claim); Robinson v.
The Devereaux Foundation, No. 14-01-00081-CV, 2002 WL 1315631 (Tex.App.–Houston
[14th Dist.] June 6, 2002, pet. denied) (mem. op.) (Sabine Pilot claim).
          Wheeler, Orr and other EDS employees testified to other reasons for the actions
Marx cites. Orr testified he initiated a PIP for Marx because of the frustration he was
having with Marx’s performance. In particular, Orr was concerned about Marx’s “inability
to effectively deliver upon his projects.” He “thought the appropriate action was to put forth
some type of a formal performance-improvement plan.” 
 
          Although he correctly notes the company did not actually reduce his salary until
March 2006, Marx acknowledges the subject had been discussed for some time. The
evidence shows that Wheeler told him in 2004, shortly after he became Marx’s manager, 
his salary did not match his job code.


 As Wheeler put it, he told Marx that his salary was 
“way out of whack for your position title.” Wheeler testified that the reason for Marx’s
salary change was “due to the fact that the role that [Marx] was performing was an
infrastructure specialist job, and I was aligning him to that role.” Orr also indicated that
Marx’s salary was reduced “[b]ased on performance issues and the job that [Marx] was
performing.” He stated Marx’s “performance was poor and that he was not performing to
an adequate level of the job code that he was in.” Further a “job code change would have
put [Marx] into a job code category that was more reflective of what his responsibilities
were and able to handle.”
          Marx argues his appeal is supported by Morales v. SimuFlite Training Intern.,
Inc., 132 S.W.3d 603, 609 (Tex.App.–Fort Worth 2004, no pet.) and Allen v. Powell, 989
S.W.2d 776 (Tex.App.–Amarillo 1998) aff’d in part, rev’d in part, Powell Industries, Inc. v.
Allen, 985 S.W.2d 455 (Tex. 1998). We disagree. Powell produced evidence he was fired
because he refused to authorize payment of personal expenses of the president of his
company. Powell, 989 S.W.2d at 779-81. Evidence in Morales showed he was fired for
refusing to sign a government-required form in blank. Morales, 132 S.W.3d at 609. In the
face of that evidence, the appellate courts in both cases found that alternative reasons for
the firings did not justify removing the cases from the jury. Both courts said determination
of the true reasons for the firings were questions for the fact finders. Morales, 132 S.W.3d
at 610; Powell, 989 S.W.2d at 781-81. Here, by contrast, Marx has not produced more
than a scintilla of evidence to meet the causation requirement for his Sabine Pilot claim. 
          We overrule Marx’s first issue.
Slander Claims
                     In Marx’s second issue, he argues that the trial court erred also in granting
summary judgment on his slander claim. EDS challenged Marx’s claim by asserting that the
statements of which Marx complains are not defamatory. We agree. 
Applicable Law
          Slander is a defamatory statement orally communicated or published to a third
person without legal excuse. Randall’s Food Mkts., Inc. v. Johnson, 891 S.W.2d 640, 646
(Tex. 1995); Austin v. Inet Technols., Inc., 118 S.W.3d 491, 496 (Tex.App.–Dallas 2003,
no pet.); AccuBanc Mortgage Corp. v. Drummonds, 938 S.W.2d 135, 147 (Tex.App.–Fort
Worth 1996, writ denied). A statement is defamatory if the words tend to injure a person’s
reputation, exposing the person to public hatred, contempt, ridicule, or financial injury. Inet,
118 S.W.3d at 496; Cecil v. Frost, 14 S.W.3d 414, 417 (Tex.App.–Houston [14th Dist.]
2000, no pet.). In a defamation action, the initial question whether the words used were
reasonably capable of a defamatory meaning is a question of law to be decided by the trial
court. Musser v. Smith Protective Servs., Inc., 723 S.W.2d 653, 645 (Tex. 1987). The court
construes the statement as a whole in light of surrounding circumstances based on how a
person of ordinary intelligence would perceive the entire statement. Id.; Cecil, 14 S.W.3d
at 417. A statement may be false, abusive, unpleasant, or objectionable to the plaintiff but
not be defamatory in light of the surrounding circumstances. Columbia Valley Regional
Med. Ctr. v. Bannert, 112 S.W.3d 193, 198 (Tex.App.–Corpus Christi 2003, no pet.).
          The opinion of the plaintiff in a defamation action has no bearing on whether the
words or statements at issue are actually defamatory. Houseman v. Publicaciones Paso
del Norte, S.A. DE C.V., 242 S.W.3d 518, 524 (Tex.App.–El Paso 2007, no pet.).
Analysis
          All of the statements Marx alleges defamed him were made by other members of his
work group at EDS. The first was made when Marx entered his work cubicle one day
without saying anything while co-workers were holding a conversation on the other side of
the cubicle wall. Another network engineer, Annette Harris, said, “I think Ron’s over there”
and then said “yeah, you know, the sneaky snake is here.” The second statement also was
made by Harris, this time during a staff meeting. During conversation in the meeting, Marx
referred to himself as a “hunt and peck” typist. Harris remarked, “Yeah, you’re a slow
pecker.” The third statement was made on an occasion when Jensen saw Marx sitting in
his cubicle. He commented to Harris and another co-worker, Brian Moreno, “Ron doesn’t
look like a happy camper today.” He then told Marx, “you should get on some, you know,
happy pills or some–you need some kind of medication.” Harris chimed in, adding, “You
know, they got medication for your problems.”
          Finally, Marx complains of a comment made about his use of a coffee mug. Once
when Marx returned to his desk to find his mug missing, Jensen told Marx there was a mug
in the lab he could use. Marx got the mug, washed it, and got coffee. When he returned
with the mug, Jensen and Orr were standing together. Jensen said to Orr, “Isn’t that your
coffee cup, Gene?” Orr responded, saying to Marx, “Yeah, you’d better wash it before you
get laid off.” 
          We conclude, as a matter of law, none of the statements was defamatory. 
Considered in the office context in which they were made, we find that a person of ordinary
intelligence would not perceive any of them as injurious to Marx’s reputation, exposing him 
to public hatred, contempt, ridicule, or financial injury. Musser, 723 S.W.2d at 655. Even
Marx, in his deposition, stated that in isolation each of the comments could be considered
jokes or “kidding.” Taken together, however, he said they are “[a] little alienation. A little
more harassment. A little more degrading nonsense.” Nonetheless, the trial court did not
err by granting EDS summary judgment against Marx’s slander action based on these
statements.
          Marx also alleged as slanderous a statement made by an EDS manager to a Sabre
employee that Marx had not been honest in his disclosures about EDS’s billings, and
statements made by Harris and Jensen that Marx was “no good” and “could not be trusted.” 
The only summary judgment evidence of the statements came from Marx’s deposition. He
testified he did not hear the statements, but was told about them by third parties. By
motion, EDS asked the trial court to strike Marx’s summary judgment evidence of the
statements as hearsay and thus improper summary judgment evidence.


 EDS’s motion
to strike was filed three days before the trial court signed an order stating only it granted
EDS’s motion for summary judgment. The court’s order did not address EDS’s motion to
strike summary judgment evidence. About two weeks later, the trial court signed the
judgment from which Marx appeals, which is entitled “Amended Order Granting Defendant’s
Motion for Summary Judgment.” That judgment recites the court considered EDS’s motion
for summary judgment, Marx’s response, and “all evidentiary objections and motions to
strike made in connection with the Motion.” 
          The parties’ appellate briefs discuss the issue whether Marx’s deposition testimony
to the assertedly slanderous statements was hearsay. We agree with EDS the testimony
was hearsay. Marx testified to the out-of-court statements of third parties. His testimony
was offered to prove the truth of the third parties’ statements to him that the slanderers
made the offending statements. The grant of EDS’s motion to strike Marx’s testimony to
the statements involved no abuse of discretion. See Southland Corp. v. Lewis, 940 S.W.2d
83, 85 (Tex.1997) (holding affidavit contained “clearly inadmissible hearsay” and therefore
was not competent summary judgment proof); Souder v. Cannon, 235 S.W.3d 841, 851
(Tex.App.–Fort Worth 2007, no pet.) (holding hearsay objection to statement in affidavit
should have been sustained and reviewing court therefore would not consider the
statement).
          Further, applying case law from the Second Court of Appeals,


 we find the trial
court’s statement in its amended order that it “considered” EDS’s motion to strike, coupled
with its grant of EDS’s motion for summary judgment, constituted an implicit granting of the
motion to strike as well. See Frazier v. Yu, 987 S.W.2d 607, 619 (Tex.App.–Fort Worth
1999, pet. denied) (finding implied ruling sustaining summary judgment movant’s
objections); Blum v. Julian, 977 S.W.2d 819, 823-24 (Tex.App.–Fort Worth 1998, no pet.)
(finding implied ruling overruling non-movant’s objections). See also Winn v. Spectrum
Primary Care, Inc., No. 02-07-038-CV, 2008 WL 1867296 (Tex.App.–Fort Worth April 24,
2008, pet. denied) (mem. op.) (finding implied ruling overruling non-movant’s objections).
          We overrule Marx’s second issue. His two remaining issues dealt with damages. 
Having affirmed the trial court’s disposition of his causes of action against EDS, it is not
necessary to address the damage issues. See Tex. R. App. P. 47.1.
          Accordingly, the judgment of the trial court is affirmed.
 
James T. Campbell

Justice